UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CRAIG LEGGON, JR.,

      Plaintiff,

v.                                       Case No. 3:20cv5539-LC-HTC

OFFICER WILEY,
T. E. A. BEERS,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Plaintiff's amended complaint, seeking monetary damages against Defendants for violations of the Eighth Amendment claims under 42 U.S.C. § 1983, arising out of an alleged failure to protect him from an attack by another inmate. ECF Doc. 11. The matter was referred to the undersigned Magistrate Judge for preliminary screening and report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(C). Defendants have moved for summary judgment, ECF Doc. 47, and Plaintiff responded on July 7, 2021, ECF Doc. 53. Upon review and careful consideration of the parties' submissions, the undersigned recommends the motion be GRANTED and judgment entered in favor of Defendants on all claims.

## I.    PLAINTIFF'S AMENDED COMPLAINT

Plaintiff sues two correctional officers, Beers and Wiley, for failing to protect him from an attack by another inmate in April 2020, while he was an inmate of the Florida Department of Corrections ("FDOC"), incarcerated at Santa Rosa Correctional Institute ("SCRI"). The following facts are taken from the Plaintiff's amended complaint:

1.    Between October 2019 and January 2020, "[s]ecurity at Santa Rosa CI were made aware through the grievance procedure that I was in fear of my life and I specifically named the inmate that wound up stabbing me." ECF Doc. 11 at 5. In a November 18, 2019, informal grievance, at ECF Doc. 50 at 1, Plaintiff requested protected custody and alleged, "The G's, the Bloods and the people on the wing are trying to kill me. I was told I have a hit on my head." *Id.* at 1. While Plaintiff admitted in the grievance, "I don't know real names", he was able to provide room numbers and nicknames for several of them. *Id.*

2.    The matter was investigated by Lt. Christopher Hughes, who interviewed Plaintiff on November 20, 2019, and received a witness statement from Plaintiff that said, in its entirety, "I FEAR GOD. I AM GOD #Facts." ECF Doc. 50 at 3 (Hughes' response); *Id.* at 8 (Plaintiff's signed witness statement). Lt. Hughes left Plaintiff in his then-assigned cell pending protective management review and forwarded the matter to the "Correctional Officer Chief" for further review. *Id.* at

3.  An unidentified colonel, on November 21, 2019, reviewed the matter and wrote that Lt. Hughes had sent the inmate to be seen by mental health staff.  *Id.* The warden reviewed and approved the response on November 21, 2019.  *Id.*

3.      The protective management review was conducted by Investigator C.W. Smith, who interviewed Plaintiff on December 5, 2019 and entered his report the next day.  ECF Doc. 50 at 5.  He stated that Plaintiff told him, "I've never been in fear of my life."  When Smith asked him why, then, did he write the informal grievance, Plaintiff responded, "I did not write that informal grievance", signed a witness statement that said, "I did not write that request. I am not in fear of my life either, and never was", and signed a protection waiver requesting to be released from administrative confinement pending protection.  *Id.*

4.      Plaintiff explains in the amended complaint that he made that statement to Smith because "Lt. Wheaton brought me the protective management forms non-discreetly, causing the dorm to go into an uproar calling me a snitch, therefore placing my life in more danger.  Feeling conspired against at the time, I denied writing the protective management request." ECF Doc. 11 at 5 (spelling and grammatical errors cleaned up).

5.      Five months later, on Thursday, April 23, 2020, Plaintiff "held the feeding flap and brought to Officer Wiley's attention that [he] was in fear for [his] life." Plaintiff also named the inmate that wound up stabbing him.  *Id.*  Officer Wiley

said he would move Plaintiff but asked him to wait until Monday. *Id.* Plaintiff alleges that that Monday, April 27, 2020, before showers, he reminded Wiley of his request to move. Wiley responded, "Don't worry, later I got you." *Id.*

6. Plaintiff was attacked by Isaac that day on the way back to his housing cell after his shower. Plaintiff alleged that, before the attack, both defendants violated Florida Administrative Code ("FAC") § 33-208.002 rules of conduct #24, by failing to strip-search Isaac before exiting his cell for a shower and failing to search the shower cell Isaac used prior to letting Isaac, a CM1 inmate, use it.

7. Plaintiff alleges that "due to the well known knowledge and history of a widespread abuse of the malfunction of the lock mechanism on shower cell doors being manually opened by inmates", Officer Wiley "added to the already heightened risk of danger by not double locking the shower cell door", which allowed Isaac to open the door and attack Plaintiff. *Id.* at 6 (cleaned up). Plaintiff alleges that Wiley did not double lock the shower cell door despite "forementioned knowledge of a dangerous situation at hand" and the "well known knowledge and history of a widespread abuse of the malfunction of the lock mechanism on shower cell doors." *Id.* at 6.

8. Also, he alleges defendants violated FAC § 33-601.800, which, according to Plaintiff, "states a minimum of two officers must be present to roll (CM1) cell doors." *Id.* Plaintiff alleges that threats against Plaintiff's life were

shouted from the showers between 10 a.m. and 3 p.m., which can be heard on institutional audio. Plaintiff alleges Wiley heard these threats and told Plaintiff, "don't worry I got you."

9.  On the morning of April 27, 2020, Wiley opened Plaintiff's shower cell door and began escorting him to his housing cell, "during count, when all inmate movement was supposed to be ceased." ECF Doc. 11 at 5-6. As described more fully below, Isaac left his shower cell at this time and attacked Plaintiff with a knife. *Id.* Plaintiff claims that "[o]nce the inmate began stabbing me Ofc. Wiley never intervened by using force or chemical agent." *Id.* at 6.

## II.  SUMMARY JUDGMENT STANDARD

To prevail on a motion for summary judgment, Defendant must show Plaintiff has no evidence to support his case or present affirmative evidence that Plaintiff will be unable to prove his case at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). If Defendants successfully negate an essential element of Plaintiff's case, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 248 (1986) (emphases omitted). An issue of fact is material if it is a legal element of the

claim under the applicable substantive law which might affect the outcome of the case. *See id.*; *accord Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 998 (11th Cir. 1992).

Additionally, the Court must view all the evidence, and all factual inferences reasonably drawn from the evidence, "in the light most favorable to the non-moving party." *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 918 (11th Cir. 1993). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir.1992) (citing *Mercantile Bank & Trust Co. v. Fidelity and Deposit Co.,* 750 F.2d 838, 841 (11th Cir. 1985)).

## III.    SUMMARY JUDGMENT EVIDENCE

Defendants rely on the following evidentiary materials in support of their motion.  In Exhibit A, ECF Doc. 50, Defendants include several documents relating to Plaintiff's complaints through the grievance procedure from November 2019 to April 2020; the Inmate Request of November 18, 2019 in which Plaintiff sought protective management; Plaintiff's waiver of right to be present at close management hearing dated February 2, 2020; Incident Report from November 20, 2019 by Lt. Hughes; Protection Waiver signed by Plaintiff, dated December 5, 2019; Report of Protective Management, dated December 6, 2019, by investigator C.W. Smith; Plaintiff's Witness Statement, dated December 5, 2019.

Exhibit B, filed under seal, is the video of the incident, provided from four angles, which as discussed below, shows the inmate attack. Exhibit C is Isaac's declaration. ECF Doc. 47-1. Exhibit D is the Report of Force Used against Isaac by Wiley and the use of force against Plaintiff and Isaac, filed by Wiley and approved by Lt. Hughes and Major Rushing. ECF Doc. 47-2. Finally, Exhibit E is the Report of the Office of the Inspector General regarding the incident, signed by Inspector Lee Martin on May 7, 2020.

Plaintiff did not supply any evidentiary materials other than his amended complaint. Because the amended complaint is sworn, the Court will consider specific facts in that pleading on summary judgment. *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). The Court, however, cannot consider the allegations made in Plaintiff's written response to summary judgment, ECF Doc. 53, as evidence because Plaintiff did not sign the response under penalty of perjury. Regardless, even considering Plaintiff's allegations in the response, those allegations are still insufficient to create a genuine issue of material fact.

As discussed more fully below, the video evidence blatantly contradicts Plaintiff's claims that Wiley did not intervene to protect Isaac from stabbing him. The video and Isaac's declaration also contradict Plaintiff's allegations that Defendants allowed Isaac to enter the shower stall by not locking the shower door.

Also, despite being specifically directed that he cannot rely on mere denials or the allegations in his pleadings to defeat summary judgment, Plaintiff has otherwise failed to support his claims with any evidence. Thus, the undersigned respectfully recommends that the motion for summary judgment be GRANTED and judgment entered for the Defendants on all claims.

## IV.    DISCUSSION

"'[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners.'" *Farmer v. Brennan,* 511 U.S. 825, 833 (1994). "It is not, however, every injury suffered by one inmate at the hands of another that translates into a constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. "An Eighth Amendment violation will occur when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not 'respond[] reasonably to the risk.'" *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (quoting *Farmer,* 511 U.S. at 844). In this regard, "merely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Brown v. Hughes,* 894 F.2d 1533, 1537 (11th Cir.1990). Moreover, the risk must be specific and imminent; "a generalized awareness of risk in these circumstances does not satisfy the subjective awareness requirement." *Carter,* 352 F.3d at 1350.

"The known risk of injury must be a strong likelihood, rather than a mere

possibility before a guard's failure to act can constitute deliberate indifference." *Brown v. Hughes,* 894 F.2d 1533, 1537 (11th Cir.1990) (citations and internal quotations omitted). Moreover, to be deliberately indifferent, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference.*" *Farmer,* 511 U.S. at 837 (emphasis added).

Thus, to survive summary judgment on a deliberate indifference failure-to-protect claim, a plaintiff must provide evidence which creates a genuine issue of fact regarding (1) a substantial risk of serious harm; (2) the defendant's deliberate indifference to that risk; and (3) a causal connection between the defendant's conduct and the Eighth Amendment violation. *See Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015). Not one of Plaintiff's claims satisfies these elements.

## A.    Defendants' Failure to Place Plaintiff in Protective Management

As stated above, Plaintiff's first Eighth Amendment claim against Defendants arise out of Defendants' failure to place him in protective management after he complained about fears that Isaac would stab him. ECF Doc. 11 at 5. While it is true that Plaintiff submitted a grievance in November regarding threats by inmates, it is also undisputed that Plaintiff recanted those statements of fear in December of 2020 and specifically waived placement in protective management. When the protective management investigator interviewed Plaintiff, he flatly denied that he

feared for his life. He even denied writing the first informal request. Thus, even if Wiley and Beers had been aware of his initial complaint, Plaintiff's retraction of it, and waiver of his request to be in protective management, would have removed any reason for them to be aware of a substantial and imminent risk to Plaintiff.

Regardless, Plaintiff does not allege nor has he presented any evidence to show that Wiley or Beers had any knowledge of the grievance or Plaintiff's initial complaints about Isaac. The informal request of November 18, 2020 was addressed to the inspector general, and responded to by Lt. Hughes, C.W. Smith, an unidentified colonel, and the Warden. ECF Doc. 50. Wiley and Beers' names do not appear on any of the grievances, responses or investigative reports in ECF Doc. 50. Also, Plaintiff does not allege or offer evidence that he filed any other grievances or requested protective management after the November 18, 2020 grievance. Indeed, Plaintiff does not allege that he ever told Beers of any potential threat by Isaac. And, although he alleges he told Wiley of a threat by Isaac the Friday before the Monday attack, Plaintiff admits that Wiley told him he would move him. Thus, Wiley's response was reasonable.

An "official may escape liability for known risks 'if [he] responded reasonably to the risk, even if the harm ultimately was not averted.'" *Swain v. Junior*, 958 F.3d 1081, 1088-89 (11th Cir. 2020) (quoting *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004)). "Deliberate indifference requires the defendant

to have a subjective 'state of mind more blameworthy than negligence,' ... closer to criminal recklessness." *Id.* (quoting *Farmer*, 511 U.S. at 835). Plaintiff has presented no evidence to show that Wiley possessed such a culpable state of mind. The fact that Isaac attacked Plaintiff before he was moved does not show that Wiley acted with deliberate indifference. A prison official may avoid Eighth Amendment liability for failure to protect an inmate by showing he "responded reasonably" to a known substantial danger, "even if the harm ultimately was not averted." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 618 (11th Cir. 2007) (quoting *Farmer*, 511 U.S. at 844)) (internal quotations omitted).

Not only was Wiley's response to Plaintiff's protective management request reasonable, but Wiley also acted reasonably by locking the shower doors and moving Plaintiff from the shower cell to his housing cell "during count" when there would be no inmate movement to worry about. ECF Doc. 11 at 5-6. In Isaac's declaration, he avers that he "paid a guy" to alert him when Plaintiff came out of his shower stall, that he "knew a way to disable the double-lock" and that he "opened it, snuck down the stairs to pursue inmate Leggon downstairs." ECF Doc. 47-1 at 1-2. The fact that Isaac had a look out guy and was able to disable the lock refutes any allegation that Wiley acted with deliberate indifference. There is no evidence, for example, that Wiley knew that Isaac was able to disable the locks.

At best, Wiley may have acted negligently in not immediately placing Plaintiff in protective management.  Neither negligence nor a lack of due care, however, are actionable under section 1983.  "[T]he protections of the Due Process Clause, whether procedural or substantive, are just not triggered by a lack of due care by prison officials." *Davidson v. Cannon,* 474 U.S. 344, 348 (1986).  In *Davidson*, for example, an inmate sent a note to prison staff on a Friday about a threat he had received, but officials failed to immediately address the inmate's concern, and the inmate was attacked that weekend.  The Supreme Court, nonetheless, affirmed judgment in favor of defendants, stating that "Respondents' lack of due care in this case led to serious injury, but that lack of care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent."  *Id.* at 347–48; *see also, Williams v. Landress,* 2005 WL 2291412, at *3 (M.D. Fla. Sept. 20, 2005) (granting summary judgment in favor of defendants on failure to protect claim relating to an inmate attack because "Williams has not shown that Lt. Moskowitz and Landress had the requisite actual knowledge that he was going to be attacked.").

## B.    Defendants' Failure to Follow FDOC regulations

Plaintiff alleges that Wiley and Beers failed to follow FDOC regulations that require that the Isaac be strip searched, his shower cell searched prior to use, the cell double-locked, and at least two officers present when opening "CM1" cell doors.

ECF Doc. 11 at 5-6. As an initial matter, noncompliance with prison regulations by prison officials is not, in itself, sufficient to give rise to a § 1983 claim upon which relief may be granted. *See Sandin v. Conner*, 515 U.S. 472, 481–82 (1995) (noting that many prison regulations "are primarily designed to guide correctional officers in the administration of a prison" and that "such regulations are not designed to confer rights on inmates"); *Mathews v. Moss*, 506 F. App'x 981, 984 (11th Cir.2013) (district court properly dismissed prisoner's claim concerning prison officials' alleged failure to follow prison procedures with respect to grievances); *Taylor v. White*, CV 11–0377–CG–N, 2012 WL 404588, at *5 (S.D.Ala. Jan. 10, 2012) ("A claim based on a prison official's failure to follow prison regulations or state regulations, without more, simply does not state a claim for deprivation of a constitutional right."), adopted by 2012 WL 403849 (S.D.Ala. Feb. 7, 2012); *Jones v. Schofield*, 1:08–CV–7 WLS, 2009 WL 902154, at *3 (M.D.Ga. Mar. 30, 2009) ("Prison regulations and Standard Operating Procedures do not confer federal rights to prisoners that may be enforced or redressed in a § 1983 action."). *Webb v. Brown*, No. CV 115-032, 2015 WL 2219552, at *4 (S.D. Ga. May 11, 2015).

Regardless, Plaintiff offers nothing other than pure conclusory allegations to support his position. Plaintiff has presented no evidence to show that Defendants were responsible for strip searching Isaac or that the shower doors were not double locked. While a court on summary judgment is obliged to view the evidence

favorably to the non-moving party, mere conclusory allegations are not entitled to a presumption of truth. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) (noting courts "are not bound to accept as true a legal conclusion couched as a factual allegation"); *see also Cunningham v. School Board of Lake County*, 2016 WL 1755612, at *6 (M.D. Fla. May 3, 2016) ("[w]hile this allegation is a virtual parroting of the legal standard, it provides no factual basis from which the Court can plausibly infer that the standard … has been met").

In fact, the evidence in the record contradicts Plaintiff's claims. While Plaintiff claims that Wiley failed to double lock Isaac's cell door, Plaintiff admits in his response to summary judgment that Wiley in his deposition testified that he "believes he double locked his shower but is not certain." ECF Doc. 53 at 2. Also, as discussed above, Isaac himself swore in his affidavit, "I knew a way to disable the double-lock after the officer locked me in the shower stall, so I opened it." ECF Doc. 47-1 at 2.

## C.    Failure to Intervene Claim Against Wiley

Plaintiff alleges in his amended complaint, "Once the inmate began stabbing me Ofc. Wiley never intervened by using force or chemical agent", ECF Doc. 11 at 6, and that his Eighth Amendment rights were violated "by Officer Wiley failing to protect me and failing to attempt to stop a deadly attack on me when it was his responsibility to do so." *Id.* at 7.

An officer can be liable under the Eighth Amendment if he fails to take reasonable steps to protect an inmate from assault by another inmate. *See Ledlow v. Givens,* 500 F. App'x 910, 914 (11th Cir.2012) (citing *Skritch v. Thornton,* 280 F.3d 1295, 1301 (11th Cir.2002)). "The plaintiff has the burden to demonstrate that the defendant was in a position to intervene but failed to do so." *Id.* (citing *Hadley v. Gutierrez,* 526 F.3d 1324, 1330–31 (11th Cir.2008)). Stated another way, an "officer who fails to intervene in a fight between inmates can only be held liable if he 'was physically able and had a realistic chance to intervene and act in time to protect the inmate Plaintiff.' " *Clary v. Hasty,* 2013 WL 4008634, at *4 (M.D.Ga.2013) (quoting *Glispy v. Raymond,* 2009 WL 2762636 (S.D.Fla.2009)).

As noted above, however, a clear, unobstructed video recording, with audio, of the complete incident[1] was introduced as Exhibit B. The video "blatantly contradict[s]" Plaintiff's claim that Wiley failed to protect him. *See Jones v. City of Cincinnati*, 736 F.3d 688, 692 (6th Cir. 2012) (quoting *Scott v. Harris,* 550 U.S. 372, 380–82 (2007)). Thus, the Court must "view[] the facts in the light depicted by the videotape" and cannot adopt the version of the facts offered by the Plaintiff. *See Jones*, 736 F.3d at 692; *Scott,* 550 U.S. at 380 ("When opposing parties tell two

---

[1] The video in this case was therefore not "blurry, choppy, and shot from a distance . . . [with] no audio" as was the case in *Jean-Denis v. Mason*, No. 19-10936, 2021 WL 2018648, at *4 (11th Cir. May 20, 2021) (reversing grant of summary judgment which had been based on such a video).

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

The video supplied by the Defendants contains four camera views, two of which show the incident. *See* Exhibit B. The camera view identified as G-W2 CONTROLROOM provides the best angle for the beginning of the attack, while the view identified as G-W2 FIRE EXIT provides the best view of the end of the attack. Both views are clear, unobstructed and contain audio and a running time stamp, which begins at "4/27/2020 03:28:00 PM." The time in the EverFocus application used to show the video displays a comparable timestamp using military time, so it begins at 15:28:00.

From the beginning of the video, inmates can be heard shouting, but what they are shouting is indecipherable. An officer, who Defendants identify as Officer Wiley, can be seen walking to a door at the left, far end of the series of shower cells on the ground level, to unlock the G2 tier 1 (ground level) shower cell where Plaintiff is ready to exit and return to his housing cell. The shower door opens at 15:30:29 PM, Plaintiff exits, and he and Wiley begin walking towards G2-110. At almost the same time, the G2 top tier shower door—located directly above the cell Plaintiff just left—opens and Isaac exits and runs down the stairs toward Plaintiff and Wiley.

Once Wiley realizes Isaac is running towards them, he pushes Plaintiff

towards his assigned cell. This can be seen in the camera view identified as G-W2 Fire Exit at 15:30:40. Wiley can also be heard telling Plaintiff, "Go! Go! Go! . . . Go!" as he pushes Plaintiff toward his cell. Plaintiff falls to the ground and before Isaac reaches the two men; Wiley positions himself between Plaintiff and Isaac and confronts Isaac.

At 15:30:41, Isaac lunges at Plaintiff, and Officer Wiley is seen attempting a shoulder tackle of Isaac. At 15:30:43, Isaac throws Officer Wiley to the ground, however, and jumps on top of Plaintiff. Wiley gets up and, at 15:30:45, approaches the two as if to reengage in the struggle. At 15:30:47, Wiley stops himself and leaps back and begins pulling his radio out of his back pocket, and at 15:30:49, he gets it out and is heard saying "wing 2, wing 2, wing 2" until 15:30:52. At that point, he is seen trying to retrieve something else from his clothing or an equipment holder from 15:30:52 to 15:30:55, which he explains in the Use of Force Incident Report was a chemical agent cannister. ECF Doc. 47-2 at 3.

Wiley manages to retrieve the chemical agent canister at 15:30:55 and is seen running after Isaac with his arm extended in shooting position, causing Isaac to retreat to his cell at 15:30:57. Wiley pursues Isaac, and slams Isaac's cell door shut once Isaac goes inside. 15:31:04. Plaintiff gets up and walks toward his cell. On the G-W2 CONTROLROOM video, Plaintiff can be seen walking to the middle of the cell area, assisted by Wiley and another officer who arrives at 15:31:14.

It is clear from the video that Wiley took action to prevent or stop Isaac's attack on Plaintiff.  As described above, as soon as Wiley became aware of Isaac, he pushed Leggon out of the way and placed himself between Leggon and Isaac.  A struggle took place between Wiley and Isaac, during which Wiley was shielding Plaintiff.  It was not until Isaac threw Wiley to the side that he left Plaintiff's side. Even then, Wiley radioed for help and pursued Isaac with chemical agents until Isaac retreated to his cell.   While Wiley may not have been able to prevent the attack, it certainly cannot be said that he did not try to do so.

Plaintiff, nonetheless, takes issue with the fact that Wiley did not attempt to pull Isaac off of him after Isaac threw Wiley to the side.  As a matter of law, however, "'no rule of constitutional law requires unarmed officials to endanger their own safety in order to protect a prison inmate threatened with physical violence.'" *Seals v. Marcus,* 2013 WL 656873, at *8 (M.D.Ga.2013) (quoting *Longoria v. Texas,* 473 F.3d 586,594(5th Cir.2006)); *see also Prosser v. Ross,* 70 F.3d 1005, 1008 (8th Cir.1995) ("[P]rison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm."); *Winfield v. Bass,* 106 F.3d 525, 532 (4th Cir. 1997) ("[A]ll of the authority of which we are aware leads to the conclusion that such heroic measures are not constitutionally required."); *Patmon v. Parker*, 3 Fed. Appx. 337, 338 (6th Cir. 2001) ("[P]rison guards have no constitutional duty to intervene

in an armed assault by an inmate when the intervention would place the guard in danger of physical harm.").

Regardless, Plaintiff's attempt to portray Wiley as doing nothing is simply not supported by the video. Although Wiley did not reengage Isaac physically after he was thrown to the side, Wiley did call for help and threaten Isaac with chemical agents to get him to retreat. Wiley's conduct as depicted in the videos not only met but exceeded constitutional muster.

### D.    Failure to Remedy Defective Locks on Shower Cell Doors

Plaintiff's final Eighth Amendment claim is based on Wiley's alleged failure to fix the locks on the shower cell doors. Plaintiff claims that Wiley was deliberately indifferent to Plaintiff's safety concerns because he knew of the threats by Isaac against Plaintiff and "due to the well known knowledge and history of a widespread abuse of the malfunction of the lock mechanism on shower cell doors being manually opened by inmates." ECF Doc. 11 at 6. Plaintiff claims, "[h]ad this known default in the lock mechanism on the shower cell doors been fixed adequately . . . I would not have been nearly fatally injured." *Id.* Respondent argues that even "assuming *in arguendo* that there actually was a default in the lock mechanism on the showers, this cannot be imputed to Defendant Wiley." ECF Doc. 47 at 11-12. The undersigned agrees.

First, Plaintiff has presented no evidence that the shower locks were defective or that it was Wiley's (or Beers') responsibility to fix the locks. Second, even if he had offered any such evidence, Plaintiff offers no evidence that Wiley (or Beers) knew the shower locks were defective. His reference to an alleged "well known history" of abuse of the malfunction is not only conclusory, but even if it were not, would nonetheless be insufficient at the summary judgment stage. Plaintiff must show that Defendants actually knew of the risk, which he has not done. *See Farmer*, 511 U.S. at 841 (expressly rejecting an "understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice" alone).

The *Farmer* Court noted that while a condition that is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" can be evidence of actual knowledge of the risk, it limited that to case where "circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it." *Id.* at 842–43. Plaintiff has not alleged, much less offered proof, that Defendants were exposed to information concerning the malfunctioning shower locks. Therefore, Plaintiff has not met his burden of providing "evidence sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id.*

## IV.  CONCLUSION

For the reasons set forth above, the undersigned finds Defendants' motion for summary judgment should be GRANTED on all of Plaintiff's claims.

Accordingly, it is respectfully RECOMMENDED that,

1.      Defendant's Motion for Summary Judgment, ECF Doc. 47, be GRANTED.

2.      The clerk be directed to enter final judgment on all claims in favor of Defendants Beers and Wiley.

3.      The clerk be directed to close the case.

At Pensacola, Florida, this 18th day of August, 2021.

/s/ Hope Thai Cannon

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within **fourteen (14) days** of the date of the Report and Recommendation. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.